194 P.2d 444

**O'MALLEY et al. v. CENTRAL METHODIST CHURCH.**

No. 5020.

Supreme Court of Arizona.

May 25, 1948.

Jennings, Strouss, Salmon & Trask, J. A. Riggins, Jr., Henry S. Stevens, and Burr Sutter, all of Phoenix, for appellants.

Gust, Rosenfeld, Divelbess, Robinette & Linton, of Phoenix, for appellee.

J. SMITH GIBBONS, Superior Judge.

The plaintiff (appellee), a nonprofit corporation, owned or had options to purchase lots 10, 11, and 60, in Los Olivos Subdivided, an addition to the City of Phoenix, and announced its intention to erect a church edifice and construction incident thereto to carry out the activities of a modern church. Defendants (appellants), owners of lots in Los Olivos Subdivided and Los Olivos Amended, claim that certain building restrictions imposed upon lots in said subdivisions prohibit the erection of said church. The plaintiff instituted this class action against the above-named defendants, who are being sued individually and as representatives of the owners of all the lots in said subdivision, to have this controversy between it and said lot owners adjudicated and determined under the provisions of the Declaratory Judgment Act.

Since everything depends upon the history of the titles, covenants referred to, and the intent of the parties viewed in the light of surrounding circumstances and conditions, a statement of the salient facts is necessary to a proper understanding of the precise questions involved. L. H. Chalmers and Laura E. Chalmers, his wife, owning approximately five acres, Dwight B. Heard and Maie B. Heard, his wife, owning approximately 10 acres, and A. C. Bartlett and Abby H. Bartlett, his wife, owning the remainder of a 160-acre tract, on December 21, 1906, joined in a plat subdividing the Southeast Quarter of Section 32, Township 2 North, Range 3 East, into lots and blocks of approximately 5 acres or more, under the name of Los Olivos, and filed the same on the 11th day of June, 1907. Thereafter, and before the 30th day of November, 1909, A. C. Bartlett and wife conveyed certain lots in said subdivision as follows: Lot 25 to Samuel H. Hanger, Lot 32 to Ella McElhaney, Lot 29 to H. O. Winslow, Lot 28 to Christina Wurst, and Lot 13 to Louise Wight Path; each of said lots containing approximately 5 acres; the south half of Lot 22 to Amelia Renau, and the South half of Lot 20 to J. T. Whitney; each of said lots containing approximately two and one-half acres. On the 30th day of November, 1909, A. C. Bartlett and wife, Dwight B. Heard and wife, and each of all of the grantees and their spouses of the above listed lots filed in the office of the County Recorder a further plat of the Southeast Quarter of said Section 32, being the same tract of land covered by the earlier

plat of Los Olivos, and designated the new plat Los Olivos Amended.

In neither of the said plats were restrictions of any kind imposed upon the lots therein contained, nor were there, until after the filing of Los Olivos Amended, restrictions of any kind imposed upon any of the lots in said subdivision by any instrument, except that certain of the conveyances above mentioned contained a personal covenant that the grantee would erect a dwelling house upon the land purchased and that it would be set back a certain distance from the street lines in said tract.

Thereafter, on May 11, 1911, L. H. Chalmers and wife, owners of Lot 9, George E. Lilley and wife, owners of the west half of Lot 24, Charles Riegel and wife, owners of the east half of Lot 24, E. E. Kirtland and wife, owners of Lot 18, and A. C. Bartlett and wife, owners of the remainder of the land involved, filed a further plat of the Southwest Quarter of the Southeast Quarter of said Section 32, being the Southwest Quarter of the tract formerly platted as Los Olivos and Los Olivos Amended, that the name of the subdivision was Los Olivos Subdivided, and no restriction of any kind was imposed upon any of the lots therein contained by said plat. After filing the plat of Los Olivos Subdivided, A. C. Bartlett and wife conveyed certain lots in said subdivision to various purchasers by deeds containing the following restrictions:

"It is mutually covenanted and understood between the parties hereto that Los Olivos Amended, within which the above described premises are situate and of which they constitute a part, has been platted and laid out as a choice and attractive residence subdivision, and to protect all lot owners in the enjoyment of their respective lots therein, it is hereby covenanted on the part of the party of the second part, his heirs, executors, administrators and assigns, that neither they or any of them, will erect or maintain or suffer or permit to be erected or maintained on the above described premises, any building or structure other than a dwelling house, with the necessary and usual outbuildings, and that no saloon or place for the sale of intoxicating liquors, and no hospital, sanitarium, hotel, lodging or boarding house used or occupied as such for the care, lodging and entertainment of persons suffering from disease, and no building used or occupied for any purpose that shall depreciate the value of the neighboring property for dwelling house purposes shall ever be maintained, kept or permitted upon said premises or any part thereof."

(Also provides for minimum costs of dwellings to be erected within a specified time, and sets forth the distances said buildings are to set back from the street line.)

Said restriction further provides:

"All covenants herein contained attach to the land and run with the title thereto, and for any violation of the covenants of the

second party herein contained by said second party, his heirs, successors, representatives or assigns, said premises shall become forfeited and revert to the parties of the first part, their heirs and assigns."

The trial court found that the recital contained in deeds to lots in said subdivisions, viz.: "It is mutually covenanted and understood between the parties hereto that * * * has been platted and laid out as a choice and attractive residence subdivision, and to protect all lot owners in the enjoyment of their respective lots therein, it is covenanted by the second parties * * *," was not true for the reason that Ella McElhaney, Bernard Wurst, Amelia Renau, S. M. Hanger, E. O. Path, J. T. Whitney, Dwight B. Heard, H. O. Winslow, and L. H. Chalmers, being the owners of lots in said tract amounting to approximately one-fourth of the entire tract, never had any part in executing said deeds nor agreed to placing any restrictions on the lots owned by them, and subsequently deeded their said lots without restrictions. The heirs of Dwight B. Heard still own Lots 7 and 8 and the daughter of L. H. Chalmers still holds a part of Lot 9 without restrictions. Business buildings of different classes and descriptions have been erected on a number of unrestricted lots, and some lots within the area are still vacant.

Lots 1, 2, 3, 55, and a portion of Lot 4, located only 350 feet from the property of the plaintiff, owned and retained by Bartlett and wife, were never subject to restrictions of any kind, and were recently conveyed by the heirs of A. C. Bartlett, and by Abby H. Bartlett to the City of Phoenix, or the Civic Center Association, to be used as a public library, art center, war memorial, Little Theater building and various other public activities.

After the Plat of Los Olivos Subdivided was filed, Bartlett and wife conveyed various lots therein by deeds containing similar restrictions to the one above set forth as contained in Los Olivos Amended, except that the cost of dwellings was changed from $5000 to $6500, and the last paragraph of the former restriction relating to forfeiture was changed to read as follows:

"All covenants herein contained attach to the land and run with the title thereto and in the event of any threatened or actual violation of any of the covenants upon the part of the party of the second part herein contained by the said second party, his heirs, successors, representatives or assigns, then said party of the second part for himself, his heirs, personal representatives and assigns, does hereby consent that an injunction may issue without notice and without bond at the suit of the parties of the first part, their heirs, representatives, or assigns or of any owner of property in said Los Olivos Subdivided to restrain such violation."

The trial court likewise found that the recitation contained in the Los Olivos Subdivided deeds which are identical with

those contained in the Los Olivos Amended deeds, as above set forth, was not true in that said L. H. Chalmers, E. E. Kirtland, George E. Lilley, and Charles Riegel, being the owners of Lots 9, 18, and 24, never had any part in executing said deeds.

On the 21st day of January, 1928, the heirs of A. C. Bartlett filed an instrument purporting to change the restrictions of any lot, tract, or parcel of land in Los Olivos Subdivision, or within any subsequent plat of said Los Olivos, providing that forfeiture for violation of said restrictions should not invalidate any mortgage made in good faith placed of record prior to action taken to enforce forfeiture, and that purchasers under foreclosure should be bound by said restrictions. All of the premises owned by plaintiff were deeded by A. C. Bartlett and wife, containing one of the above-mentioned restrictions; Lot 60 the forfeiture restriction, and Lots 10 and 11 the restriction providing for injunction. These restrictions appear in plaintiff's chain of title. Judgment was rendered for plaintiff and defendants appeal. Plaintiff by cross assignments of error has presented additional grounds, hereinafter discussed, on the basis of which it contends the judgment should be affirmed.

There has been much judicial writing upon the subject of restrictive covenants, and, as may be anticipated from the very nature of the topic, the cases abound in fine and subtle distinctions. Many of the decisions upon this branch of the law appear to be in hopeless conflict, but are usually reconcilable when the facts in each case are fully understood. In fact the courts seem to have no special difficulty in ascertaining and declaring the controlling general principles of law, but in their application to concrete facts it may well be said that the decisions are in hopeless conflict and confusion, and individual cases as precedents are not of much value, except as general principles are recognized and declared.

In the case of Korn v. Campbell, 192 N.Y. 490, 85 N.E. 687, 689, 37 L.R.A., N.S., 1, 127 Am.St.Rep. 925, the court has divided restrictive covenants into three classes, which may be helpful in arriving at the correct solution in this case. The court said:

" * * * For the particular purposes of this case such covenants may be broadly divided into three classes. In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans, generally denominated in the English cases as 'building schemes', under which an owner of a large plot or tract of land divides it into building lots, to be sold to different purchasers for separate occupancy, by deeds which *contain uniform covenants* restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other, upon the theory that there is a *mutuality of cov-*

*enant and consideration,* which binds each and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of the lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract. (Citing cases.) The second class embraces those cases in which the grantor exacts a covenant from his grantee, presumptively or actually, for the benefit and protection of contiguous or neighboring lands which the former retains. In such cases the grantees, * * * cannot enforce the covenant as against each other, although the grantor or his assigns of the property benefited may enforce it against either or all of the grantees of the property burdened with the covenant. (Citing cases.) Then there is a third class, where there are mutual covenants between the owners of adjoining lands, in which the restrictions placed upon each produce a corresponding benefit to the other, and in such a case of course, either party or his assigns may invoke equitable aid to restrain a violation of the covenant. (Citing case.)" (Emphasis supplied.)

Defendants maintain that at the time the plat of Los Olivos Amended was filed in 1909 a scheme to preserve the area as a first-class residence district came into being, and that it was the desire of the Bartletts to protect subsequent grantees in the

enjoyment of their property. No mention is made by them of the intent of the original grantees. If a general scheme or plan of development came into being as claimed by the defendants, then there must have been the joint intent of the Bartletts and their grantees to that effect. As was said in McBride v. Freeman, 191 Cal. 152, 215 P. 678, 681:

" * * * It takes two to make a contract. There must be a meeting of minds of both parties thereto. The mere fact that the vendor in the exaction of uniform building restrictions had in his own mind a general plan or scheme of improvement falls short of establishing even his own intention that such restrictions shall be for the benefit of anyone other than himself, and much less does it establish such meeting of minds between him and his grantee as is necessary to create a contract. Given such intention in the mind of the grantor, there must have co-existed a like intention in the mind of his grantee before the first element of plaintiff's cause of action can come into existence. * * *"

Such a contract or meeting of minds is not shown.

█ It is not enough even if we admit that the grantors had a general plan or scheme in mind. The intent must be mutual, and is to be ascertained from the language of the deeds, construed in connection with the circumstances existing at the time.

" * * * The rule on this subject, as declared by a long line of Texas holdings,

such as Hooper v. Lottman (Tex.Civ.App.) 171 S.W. 270, 271, and Curlee v. Walker, 112 Tex. 40, 244 S.W. 497, in brief substance is thus quoted from the former: 'Whether a person not a party to a restrictive covenant has the right to enforce it, depends upon the intention of the parties in imposing it. This intention is to be ascertained from the language of the deed itself, construed in connection with the circumstances existing at the time it was executed.'

"The intention referred to is not that of the grantor alone, but of both parties to the deed. Pierson v. Canfield, supra, where it is said: 'It requires the joint intent of the grantor and grantee, and, as between them, the instrument, or instruments, exchanged and forming a part of the transaction constitute the final and exclusive evidence of the intent of the parties. * * *'" Goodman v. Bingle, Tex.Civ.App., 48 S.W.2d 432, 433.

There appears in the wording of all deeds the following excerpt, except that different subdivisions are named therein:

"It is mutually covenanted and understood between the parties hereto that (Los Olivos Amended or Los Olivos Subdivided as the case may be) within which the above described premises are situate and of which they constitute a part, has been platted and laid out as a choice and attractive residence subdivision, and to protect all lot owners in the enjoyment of their respective lots therein, it is covenanted on the part of the party of the second part, his heirs, executors, administrators and assigns, * * *."

The foregoing contains no express covenant on the part of the grantors to incorporate identical or similar restrictions in all deeds to the subdivisions referred to. The trial court found the foregoing statement untrue, for the reason that the original subdividers in each of said subdivisions, with the exception of the Bartletts, did not have any part in the execution of said deeds containing such statements, and when said parties transferred the lands which they owned in said subdivision, they were transferred without restriction. Since statements in the deeds were untrue we must look to the surrounding circumstances for the intent of the parties. The Bartletts deeded a portion of the lands within the specified area without restriction, and it makes little difference that such deeds were executed before Los Olivos Amended was filed, for the reason that said grantors were in a position to know and did know that a part of the subdivision was owned by other parties not subject to restrictions, for they had in fact deeded said property, with the exception of the Heard and Chalmers lands, to the parties, who owned the same at the time said tracts were subdivided; and they knew or should have known whether such adjoining owners intended to join in the platting of said residence district and incorporating in the deed thereto uniform restrictive covenants. It is readily

apparent that the deeding of all lots in said subdivisions with neighborhood restrictions was not the intent of the dedicators of said plats. Even the intent of the Bartletts at the time is not plain. To begin with, deeds in Los Olivos, having the same boundaries as Los Olivos Amended, were executed by them without restrictions. After the filing of the second plat above named, said grantors changed the plan and included in the deeds a restriction providing for forfeiture of the premises to the Bartletts, their heirs or assigns. Some time after the filing of Los Olivos Subdivided, Bartletts ·again altered the plan by changing the clause relating to forfeiture to one providing for injunctive relief in favor of the grantors and any lot owner within the subdivision. It is not exactly clear just when the last change was made. It is certain that it was not at the time the Los Olivos Subdivided plat was filed May 11, 1911, for the deed from the Bartletts to Nan Hayden, dated July 31, 1912, for Lot 60 of Los Olivos Subdivided, contained the forfeiture clause. On September 10, 1912, a month and ten days after the Hayden deed, the same grantors deeded Lot 10 of the same subdivision to one Seabury, which deed contained the injunctive clause. In 1927, Abby H. Bartlett, one of the original grantors, and the heirs of A. C. Bartlett, as owners of or parties beneficially interested in the restrictions contained in all deeds given to lots in Los Olivos, or any of the subsequent plats or subdivisions, changed or attempted to change the form and content of the said restrictions. Recently the heirs of the Bartletts conveyed all of Lots 1, 2, 3, 55, and a portion of Lot 4 of Los Olivos Subdivided without restrictions for a specified use, contrary to the meaning of the restrictions as construed and interpreted by the defendants. The children and heirs of the Bartletts knew, or should have known, what the intent of their parents was in regard to said restrictions. It appears that the intent of the grantors at the time was not plain or fixed in their own minds. This is supported by the testimony of Mr. Eben Lane in reply to questions of plaintiff's attorney, as follows:

"Mr. Gust: Now there were some lots unrestricted that came to your attention after you came here? A. Yes.

"Q. I believe I heard you explain at one time that that came about because Mr. Heard at first didn't appreciate what a fine tract he had there? A. That is the way he explained it to me.

"Q. And it was after, some time after he filed the original plat that he realized that fact and then he imposed restrictions? A. Yes, sir.

"Q. At that time he no longer owned these lots that were unrestricted? A. He may have owned one or two of them, I don't know. He owned this that their home is on of course.

254

"Q. Oh, yes. A. But I would take it that most of those unrestricted lots other than his own personally had prior to that been sold or he would have restricted them when he sold them.

"Q. It came about intentionally on Mr. Heard's part? A. Natural Evolution."

General building schemes do not come into being gradually by natural evolution. A contract is made and a meeting of minds had. If a building scheme was established at the time of the platting of Los Olivos Amended and the restrictive covenants with the forfeiture provision were agreed upon and inserted in the deeds for the benefit of all lots conveyed, then such covenants would be neighborhood restrictions and be enforceable by all grantees. If not so shown the express terms of the deeds govern.

There is nothing in the evidence showing that the Los Olivos Amended restrictions, that is those containing the forfeiture clause, are other than what they purport to be. In construing such restrictions in the case of Pierson v. Canfield, Tex.Civ.App., 272 S.W. 231, 233, the court said:

"* * * It is not intended by this holding to intimate that, in a proper case, restrictions such as these may not also be enforced as covenants by purchasers of other lots under a uniform settlement scheme, but the holding is, that there is nothing in the evidence tending to show that the restrictions are other than what they purport to be, that is to say, conditions subsequent, for the violation of which the grantors, their heirs, and assigns, alone, can claim forfeiture. 12 C.J. 410; Werner v. Graham, 181 Cal. 174, 183 P. [945], 947."

See also Martin v. Ray, 76 Cal.App.2d 471, 173 P.2d 573.

We subscribe to this rule. In the case of McRae v. Lois Grunow Memorial Clinic, 40 Ariz. 496, 14 P.2d 478, we held that restrictions providing for forfeiture only were enforceable as neighborhood restrictions on the ground that the evidence established beyond doubt a plan or scheme of improvement for the benefit of each lot owner.

It is the position of the defendants that they as subsequent grantees have the right to enforce restrictions whether providing for forfeiture or injunction because a general plan or scheme is shown, and for the further reason that they claim all deeds in Los Olivos Subdivided expressly give all lot owners the right to enjoin violations of the restrictions. This contention as to the contents of such deeds is not correct. As pointed out above, the Hayden deed, describing the land conveyed as Lot 60 of Los Olivos Subdivided, dated July 31, 1912, contained the restriction providing for forfeiture and does not contain and does not provide for injunction by lot owners.

What we have heretofore said relating to the intent of parties in establishing a gen-

eral scheme or plan is equally true as applied to the contents of the deeds containing injunctive relief clauses. We must arrive at the intent of the parties from the terms of the deeds and the surrounding circumstances. The language of the restrictions providing for injunctive relief are neighborhood restrictions in form. If the statements therein are supported by the surrounding circumstances connected therewith a general plan or scheme would be established, and the provisions thereof enforceable by defendants, if not abandoned. To begin with we must face the fact that approximately one-fourth of Los Olivos Amended, or about 40 acres, is not subject to restrictions of any kind, and that approximately one-fourth of the area of Los Olivos Subdivided, or about 10 acres, is likewise not subject to any restrictions. The Bartletts and Heards are responsible for this condition with the exception of the Chalmers lands, and they or their heirs have conveyed such lands without restrictions, or used a portion of the premises thereof contrary to the express verbiage of said restrictions. Nor do the unrestricted lots have any uniformity of location such as would evidence an intention to limit the application of the claimed improvement scheme to any particular portion of the tract. Davidson v. Dunham, 159 App.Div. 207, 144 N.Y.S. 489.

The uniformity of content of the restriction must also be taken into account in building schemes. Korn v. Campbell, supra; De Gray v. Monmouth Beach Club House Co., 50 N.J.Eq. 329, 24 A. 388. In Martin v. Ray, supra, the court, quoting from Moe v. Grier, 116 Cal.App. 403, 2 P. 2d 852, said [76 Cal.App.2d 471, 173 P. 576]:

"* * * To create an equitable servitude in the grant or lands in a large area, it is essential that there must be a general scheme of restrictions sufficiently uniform in character to indicate unmistakably a designated and adopted plan throughout common to all purchasers of lots. The restrictions must not only appear in one deed, but in all the deeds, * * *. In other words, the restrictions must be for the mutual benefit of all parcel owners and each lot imposed with a servitude for the benefit of each and every other lot. * * *"

And in the case of Kliem v. Sisters of Charity etc., 101 N.J.Eq. 761, 139 A. 174, 176, where some of the lots were deeded without restrictions, and in others, the restrictions were different in form and effect, the court said:

"A general scheme of restrictions, to be effective and enforceable, must have certain characteristics. It must be universal; that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal, it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this

character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions, while others are, then the burden would be carried by some owners without a corresponding benefit. The burden follows the benefit, and where there is no benefit, there should be no burden. * * *"

Sanford v. Keer, 80 N.J.Eq. 240, 83 A. 225, 40 L.R.A.,N.S., 1090; Edgewater Beach Hotel Corporation v. Bishop, 120 Fla. 623, 163 So. 214.

■ All three lots constituting plaintiff's premises are within the plats of Los Olivos, Los Olivos Amended and Los Olivos Subdivided. In each subdivision we have three separate and distinct groups into which the lots of each subdivision may be and must be classified as far as restrictions are concerned. In the first group are those lots not subject to any restrictions; in the second group are those lots with restrictions providing for forfeiture in the case of violation; and in the third group are the lots containing restrictions with the injunctive provision. Lot 60 belongs in the second group and Lots 10 and 11 in the third group. Lots 10 and 60 corner on each other and Lot 11 lies west and adjoining Lot 60 and north and adjoining Lot 10.

Lot 13 upon which there is now no restriction is diagonally across the street from Lot 60, and the premises which were conveyed by the Bartlett heirs for the civic center are only 350 feet distant. Conforming to the restrictions as set up in this area, the owner of Lot 60 is subject to forfeiture with no right of action against the owners of Lots 10, 11, and 13. Owners of Lots 10 and 11 · have a right of action against each other and the owner of Lot 60. Lot 13 may be used for any legitimate purpose and the civil center lots used for any of the public uses for which they were conveyed without interference from anyone. These conditions more or less exist throughout the subdivisions involved in this action. Neighborhood restrictions should be substantially uniform, imposed upon each lot and are enforceable on the theory of mutuality of covenant and consideration, which binds each and gives to each the appropriate remedy. Korn v. Campbell, supra; Scull v. Eilenberg, 94 N. J.Eq. 759, 121 A. 788; Cannon v. Ferguson, Tex.Civ.App., 190 S.W.2d 831; Foster v. Stewart, 134 Cal.App., 482, 25 P.2d 497; Thornhill v. Herdt, Mo.App., St. Louis, 130 S.W.2d 175; Davidson v. Dunham, 159 App.Div. 207, 144 N.Y.S., 489; Tindolph v. Schoenfeld Bros., 157 Wash. 605, 289 P. 530, and the texts therein cited.

■ The case of Scull v. Eilenberg, supra, discusses many of the questions involved in this case and announces many of the general principles of the law appli-

cable thereto. In this opinion the court said [94 N.J.Eq. 759, 121 A. 789]:

"A neighborhood scheme of restrictions to be effective and enforceable must have certain characteristics. It must be universal; that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit. 'The burden follows the benefit', as was said by Judge White in the case of Sanford v. Keer, 80 N.J.Eq. 240, 83 A. 225, 40 L.R.A., N.S., 1090. When there is no benefit there should be no burden. If the benefit be destroyed the burden should end. The requisite universality of the neighborhood plan was referred to by the late Vice Chancellor Green in the case of De Gray v. Monmouth Beach Club House Co., 50 N.J. Eq. 329, 24 A. 388, in the following language:

" 'The law, deductible from these principles and the authorities, applicable to this case, is that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser, and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof, and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan, one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme and the covenant has been part of the subject-matter of his purchase. The right of action from this would seem to be dependent as much on the fact of the general scheme as on the covenant—a very important consideration in a case in which the question arises whether certain threatened acts are in violation of the covenant, if any ambiguity exists as to its scope and meaning.'

"Where the restrictions are not universal, or after frequent violations of the restrictions have been permitted, then the neighborhood scheme will be considered abandoned."

Defendants take the position that in a general scheme or plan it is not necessary that all of the lots within the area be sold subject to restrictions and cite Allen v. City of Detroit, 167 Mich. 464, 133 N.W. 317, 319, 36 L.R.A.,N.S., 890, in support thereof, from which we quote:

"* * * Although some of the lots may have written restrictions imposed upon them and others not, if the general plan has been maintained from its inception, and if it has been understood, accepted, relied upon, and acted upon by all in interest, it is binding and enforceable on all inter se. * * *"

The foregoing statement does not conform to the facts and surrounding circumstances in this case at all. Unrestricted lots have not been improved in conformity with restrictions, but contrary thereto. Infraction of the terms of the restrictions and not compliance seems to have been the general rule on such lots.

Applying the facts in this case to the general principles of law applicable, it is readily apparent that the restrictions under consideration herein cannot be enforced inter se as covenants of a general plan or scheme.

 The evidence strongly supports the fact that the restrictions were imposed for the benefit of the lands retained by the grantors, or for their own personal benefit. However, we need not consider this question at length. If for the benefit of the lands retained (the civic center lots), they are not enforceable inter se. The lands benefited have been conveyed and while the grantees (City of Phoenix, a municipal corporation, and Civil Center Association of Phoenix, Inc.) were made parties to this suit they are not parties to this appeal. ·The covenant of the grantees to protect all lot owners was broken and cannot be enforced. Furthermore, the heirs of the grantors, having conveyed all their land within the area, cannot enforce the restrictions. Section 71-123, A.C.A. 1939. If these covenants are within class two, they still are not enforceable for the reasons before stated.

Class three of restrictions embraces mutual covenants between owners of adjoining lands. There is no evidence in the record to sustain such a contract. In fact the evidence is against such a theory. Such a contract cannot be inferred by implication. The fact that grantees accepted deeds containing restrictions would not infer such a meeting of minds. This is contrary to the general rules governing restrictive covenants.

Defendants' contention that plaintiff's assignments of error cannot be considered by this court for the reason that the doctrine of *invited error applies is without merit.*

 Since the restrictions involved herein are not enforceable and do not prohibit the erection of the proposed church

on the premises of the plaintiff, for the reasons hereinbefore stated, it is not necessary to discuss the other questions presented by the assignments of error in this appeal.

Judgment affirmed.

STANFORD, C. J., and UDALL, J., concur.

Note: Justice ARTHUR T. La PRADE having announced his disqualification, the Honorable J. SMITH GIBBONS, Judge of the Superior Court of Apache County, was called to sit in his stead.